## Mathena vs. The State.

On the trial of an indictment for passing a counterfeit Bank note, there appeared a variance, as to the name of the President, between the note set out in the indictment and that offered in evidence, as described in the bill of exceptions—the proof showed that the name was illegible—and it appeared that the discrepancy arose from the effort of the parties to make a precise imitation of the name; *Held*, that such will not be regarded as a material variance.

In an indictment under section 20, Art. 9, chap. 51, (*Gould's Dig.*), for passing a counterfeit bank note, it is necessary that the indictment aver that the notes of the bank " circulate as currency."

*Appeal from Pulaski Circuit Court.*

Hon. John J. Clendenin, Circuit Judge.

McConaughey, for the appellant.

The indictment charges that the appellant did " utter, pass and give," etc., " one certain false, forged and counterfeited Bank note," etc.: which is absurd. If it is a *Bank note*, it cannot be counterfeit. The statute knows no such description. The statute, in creating the offence, makes it felony to utter etc., " the *counterfeit resemblance* or *imitation of* any Bank bill," etc. The indictment should have charged in the language of the statute. 1 *Ch. Cr. L.* 174, (5 *Am. Ed.*) *and notes; Ib.* 282, 283, *Marg. p., and notes;* 8 *Ark. R.* 363; *Gould's Dig., sec.* 20, *ch.* 51.

The 1st count, under which the finding was had, should have charged that the genuine bills of the Canal Banking Company " *circulated as currency* in this State." *Dig., sec.* 20, *ch.* 51; 18 *Ala. R.* 531. And the Supreme Court of Tennessee, have decided under their statute, (which this Court say, in the case

of *Gabe vs. The State,* 1 *Eng.* 524, " *is a statute of which ours is an exact copy,*") " that it is a well settled principle of crimi nal law that where a crime is created by statute, a bill of indictment found thereon must, in the description of the offence, strictly follow the statute;" and the same opinion distinctly states that the bill of indictment must aver that the genuine bills *passed as currency in the State at the time, etc.* 7 *Hump. R.* 31, 32.

The allegation that the bill was *false, forged* and *counterfeited,* sets up three distinct offences, and is fatal for repugnancy. 1 *Ch. Cr. L.* 194, *Marg. p.,* and *reference;* 1 *Ohio R.* (*by Mc-Cook*) 185; *Digest, sec.* 20, *ch.* 51; 4 *Cranch. R.* 167.

The bill described in the indictment was different from the proof and the bill offered in evidence. *Ros. Cr. Ev.* 463, 464; 8 *Humph.* 101.

HOLLOWELL, Attorney General, for the appellee.

In most cases it is advisable, and the safer practice to follow, to use the exact language of the statute creating the offence, yet all that is or can be required, under any state of case, is not to depart so far from it as not, in every way, fully to cover it; or, in other words, a substantial compliance with it, only, is essential. See *Hale's P. C.* 168, 192; *Whar. Pr.* 319; *State vs. Williams,* 17 *Verm.* 151, *and cases cited;* 1 *Ohio* 185; *East. P. C.* 980; *State vs. Gardinier,* 1 *Iredell* 27.

It is submitted that, under our statute, an allegation in the indictment, that the bills of the Bank circulated in this State as currency, is wholly unnecessary. See *Gould's Dig.,* ch. 51, *sec.* 20. In the case of *Fergus vs. State,* 7 *Yerg.* 31, under the Tennessee statute, the case was so decided; but the statute, under which the indictment, in that case, was drawn, differs materially from the provisions of our statute: and, under statutes very similar to ours, the point has not been raised. The cases turned very generally on other points, although the allegation of circulating as currency is not to be found in the indictments. *People vs. Davis,* 21 *Wen.* 309; *State vs. Benham,*

7 *Conn.* 414; *Com. vs. Cone,* 2 *Mass.* 132; *Sasser vs. State,* 13 *Ohio* 453; *Com. vs. Morse,* 2 *Mass.* 177.

As to the objection for variance, see *Gabe vs. State,* 2 *Eng.*; *Whart. C. L.* 501; *Com. vs. State,* 1 *Mass.* 54; *Com. vs. Barley,* 1 *Mass.* 62; *State vs. Carr,* 5 *N. Hamp.* 371; *State vs. Franklin* 3 *Johns. Cas.* 299.

Mr. Justice COMPTON delivered the opinion of the Court.

Appellant was indicted, tried and convicted in the Court below for passing the counterfeit resemblance of a bank note. He moved in arrest of judgment, and for a new trial. Both motions were overruled, and he excepted and appealed.

Two questions are raised upon the record: 1st, whether there is a variance between the bank note as set out in the indictment and as read in evidence on the trial; and 2d, whether the indictment is sufficient to warrant the conviction.

As to the first question, it will be sufficient to say, that whatever may be the apparent discrepancy between the note as set out in the indictment, and as set out in the bill of exceptions, so far as regards the President's signature, the testimony abundantly shows that his signature to the note was almost, if not entirely illegible. One of the witnesses testified that H. A. Rathborn was President of the Bank at the date of the note read in evidence; and all of the witnesses to whom the note was shown, said it was difficult, if indeed it were possible, to make any name out of the signature; one witness thought it looked as much like " *A. H. Rathborn,*" as did the President's signature to the genuine notes of the bank, and thought it might have been designed as an imitation of it. Owing to the illegibility thus shown by the testimony, the Attorney General, in setting out the note, word for word, in the indictment, doubtless undertook to make a precise imitation of the President's signature; the cousel who prepared the bill of exceptions, did the same thing; and the clerk, in making out the transcript, undertook to imitate what both had done.

Any discrepancy, therefore, which may appear to exist, must be attributed to the different degrees of skill possessed by the persons who undertook to copy literally what they probably could not read, and will not be regarded as a material variance.

The note produced in evidence contains the names of the *engravers*, and their places of *abode;* and, also, various letters and marks, in cypher, on the back and margin, which are ordinarily employed as a means of more easily detecting forgery. They constitute no part of the note as a particular obligation of the bank; and it might as well be required that the *watermarks*, and a *fac simile* of all the engraved ornaments on the note should be inserted in the indictment. *Whart. Crim. Law* 122.

2d. The indictment is framed on *sec.* 20, *art.* 9, *chap.* 51, *Gould's Dig.*, and charges, with requisite certainty of time and place, that " Thomas Mathena, late, etc., etc., willingly, falsely, deceitfully, and unlawfully did utter, pass, and give in payment to one Lewis Bene, one certain false, forged and counterfeit bank note, which said note was made in imitation of, and did then and there purport to be a bank note for the sum of twenty dollars, issued by the New Orleans Canal and Banking Company, a banking company incorporated by, and existing under the authority of the Legislature of the State of Louisiana, one of the United States of America, made payable to bearer on demand, numbered seven hundred and ninety-nine, and dated New Orleans, November 21st, 1855, with the name H. A. Rathborn as President of said Bank, and the name of Sam. C. Bell countersigned thereon as Cashier of said Bank, and was in the words and figures following, that is to say, etc., he, the said Thomas Mathena, well knowing, then and there, the said note to be false, forged and counterfeited, as aforesaid, with intent to defraud the said Lewis Bene, contrary," etc.

It is contended that this indictment is insufficient, because it does not aver that the notes of the New Orleans Canal and Banking Company circulate as currency.

Our penal statute touching the currency, is very comprehensive in its provisions, and the 20th section of the act (in connection with other sections on the same subject), was designed by the legislature to guard the public against the passing, or putting into circulation, false and spurious paper of every description which might be imposed upon the public as currency. The 20th section provides that " Whoever shall be guilty of forgery, counterfeiting, or of paying, or tendering in payment, buying or passing, or attempting to pass, or who shall assist, or be concerned, in paying or tendering in payment, buying, passing, or attempting to pass, the counterfeit resemblance, or imitation, of any bank bill, or any note, check or draft, or bill of exchange, or instrument, which circulates as currency, of any corporation, company, or person, or purporting to be of any corporation, company or person, that really exists, or may exist, or that does not exist, and whether such bill, note, check, draft, bill of exchange, or instrument, be complete and filled up, or otherwise, with intent to deceive and defraud, shall be imprisoned," etc.

It will be seen upon an examination of this section of the act, that two distinct classes of false and spurious paper are described—the one, embracing the " counterfeit resemblance, or imitation of bank bills, notes," etc., " which circulate as currency, of any corporation, etc., or purporting to be of any corporation," etc., which " *exists;*" and the other, embracing the " counterfeit resemblance, or imitation of bank bills, notes, etc., purporting to be of any corporation," etc., which " *does not exist.*" This distinction appears more manifestly by reference to other sections of the same act. The 21st section provides that " whoever shall keep in his possession, or conceal the counterfeit resemblance, or imitation of any bank bill, note, check, or draft, or any instrument *which circulates as currency*, of any corporation, company, or person, that *exists* or *may exist*, whether such bill, note, check, draft, or instrument be complete and filled up, or otherwise; or shall fraudulently keep in possession, or conceal any fictitious instrument, purporting

to be a bank bill, note, check, or draft of any corporation, company, or person, whether the same be filled up and complete, or not, *though no such corporation, company, or person, exist,*" etc., " shall be imprisoned," etc.

Here the distinction is clearly and broadly made, and is kept up throughout every section of the statute on the same subject. The former class consists of the counterfeit resemblance, or imitation of the *genuine* instruments enumerated in the statute, and which circulate as currency: and the latter class consists of mere paper fictions, purporting to be of any corporation, company or person *not in existence.* The 20th section prohibits the passing, etc., of both classes, and in doing so, creates and defines, in this aspect of the statute, two distinct offences.

Where the indictment, then, charges the offence to be the passing, etc., of the latter class of paper, the phraseology, " which circulates as currency," used in the statute, would not apply to or become descriptive of the offence, and should not be alleged, for, as to such paper, there could be nothing genuine to circulate as currency. The Legislature certainly did not suppose that bank bills, notes, etc., purporting to be issued by corporations, companies or persons, *having no existence,* could. ever constitute any portion of the circulating medium. Such a state of things would be most novel and extraordinary, and a community, thus liable to be imposed upon, would be beyond the protection of any penal code, however comprehensive.

In an indictment, however, like the one in the case before us, which charges the offence to be the passing of paper which comes within the former class (the counterfeit resemblance or imitation of a bank note, purporting to be of a corporation in existence), the phraseology, " which circulates as currency," applies, and is essentially descriptive of the offence created by the statute. The indictment, then, should have averred that the genuine notes of the bank circulated as currency. *The State vs. Shelton,* 7 *Humph.* 31.

We cannot judicially know that bank notes pass from hand

to hand as money—whether they do or do not so pass, depends upon the confidence of the community in the integrity of the institution which issues them, and its ability to redeem them in gold and silver. Whether they circulate as currency, is not a question of law, but is one of fact.

For the error above indicated, the judgment of the Court below must be reversed.

McCONAUGHEY, for the appellant.

HOLLOWELL, Attorney General, for the State.